UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:13-cr-00123-EJL |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER ON MOTION TO SUPPRESS** |
| vs. | ) | |
| | ) | |
| JERAMIE MAHLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before the Court in the above-entitled matter is the Defendant Jeramie Mahler's Motion to Suppress. (Dkt. 129.) The parties fully briefed the Motion and the Court held a hearing on the same on January 7, 2013. At the conclusion of the hearing, the Court directed the parties to file briefing which has been received. The Court has considered the materials submitted in the record and the evidence and arguments presented at the hearing and finds as follows.

## FACTUAL AND PROCEDURAL HISTORY

The Defendant is charged with Conspiracy to Distribute Methamphetamine and Possessing a Firearm in Furtherance of a Drug Trafficking Crime. (Dkt. 24.) The charges relate to activities occurring from on or about November 2012 involving multiple defendants who allegedly were distributing methamphetamine in the District of Idaho as well as a March 25, 2013 shooting. The instant Motion seeks to exclude all physical and

testimonial evidence obtained as a result of the vehicle search on April 2, 2013, any statements the Defendant made to a confidential informant on July 10, 2013 during an undercover video and audio recording, and the photo lineup identification of the Defendant by one David Harrod. (Dkt. 129.)

## DISCUSSION

**1.     Vehicle Search**

The Motion firsts seeks to suppress all physical and testimonial evidence obtained as a result of the April 2, 2013 traffic stop, seizure, arrest, and search of a vehicle driven by the Defendant. The basis for the Motion are: 1) the police lacked probable cause to believe a traffic violation had occurred, 2) the police lacked probable cause to search the car, and 3) there is no exception to the warrant requirement that justifies the search. (Dkt. 129 at 2.)

At 11:21 a.m. on April 2, 2013, Canyon County Deputy Sheriff Darcy Warren initiated a traffic stop of a white Audi A4 on Orchard Street in Caldwell, Idaho for speeding. The Defendant was driving the vehicle which was owned by Hernan Gomez-Gutierrez. When asked, the Defendant gave Deputy Warren his brother's name, Matthew Mahler, instead of his own and was unable to produce the car's registration, any proof of insurance, or a driver's license. Upon approaching the vehicle the Deputy noted that the Defendant was "especially nervous" and sensed that something was not right. Deputy Warren returned to his vehicle and did a license check under the name of Matthew Mahler and obtained a photograph which he believed "somewhat resembled" the Defendant.

Deputy Warren wanted a second opinion concerning the Defendant's identification and he requested assistance. Two additional Canyon County Sheriff's officers soon arrived on scene, Corporal Longoria and Corporal Chad Harrod. While waiting in the driver's seat of the Audi, the Defendant called the vehicle owner, Mr. Gomez-Gutierrez, from his cell phone.

After the officers had reviewed the driver's license photographs, they returned to the vehicle and told the Defendant to exit the Audi. The Defendant was questioned about his identity and the vehicle he was driving. Ultimately the officers obtained a photograph of the Defendant and he was correctly identified. The Defendant was then arrested for driving while suspended, driving without insurance, and for providing false information. Prior to placing him in the patrol vehicle, the officers pat searched him and located $595, keys, and noted he was wearing a tactical vest. There was no identification or wallet found on the Defendant's person.

Around the same time, the owner of the Audi, Mr. Gomez-Gutierrez, arrived on scene and identified the Defendant as "Matt." Mr. Gomez-Gutierrez told the officers that the Defendant had been test driving the car to buy it for about a week. Mr. Gomez-Gutierrez did not have identification, registration, insurance information, or a driver's license. Mr. Gomez-Gutierrez did not give consent to search the vehicle. Mr. Gomez-Gutierrez tried to call his girlfriend to bring his driver's license or other materials concerning the ownership of the vehicle and possibly move the vehicle but his girlfriend never arrived on scene.

The officers searched the "lunge area" inside of the Audi and discovered a container of suspected methamphetamine in the center console, two .40 caliber pistols, a backpack behind the driver's seat with a container of a substance that they suspected to be methamphetamine, and a hypodermic needle was found in the trunk of the car. The officers also discovered a knife and other drug paraphernalia in the Audi.

A drug dog also arrived on scene and alerted on the vehicle driven there by Mr. Gomez-Gutierrez, a Dodge Magnum. The Officers checked Mr. Gomez-Gutierrez for weapons and located a rolled-up twenty-dollar bill containing a white crystal substance. Officers then searched the Dodge and discovered a .45 caliber pistol, loaded magazines, and $2,600. Mr. Gomez-Gutierrez was then arrested.

The vehicles were taken into police custody. An inventory search was later performed at the police garage.

## A.    Traffic Violation

In the initial briefing on the Motion the Defendant argued the Government cannot establish that there was probable cause to initiate the traffic stop for speeding. (Dkt. 129.)[1] The Government asserts that the traffic stop and seizure was valid because Deputy Warren saw the Audi exceeding the speed limit and confirmed his observation with his radar gun. (Dkt. 159.) Thus, the Government contends, there was both reasonable suspicion and probable cause for the stop.

---

[1] Defendant's closing briefing does not pursue this argument. (Dkt. 217.)

At the hearing, Deputy Warren testified that he had performed the tuning fork test on his radar equipment prior to leaving the station on the day he stopped the Defendant for speeding. He further testified that his radar clocked the Audi going 67 mph in a 45 mph zone. The Court finds the evidence properly establishes that the traffic stop of the Audi for speeding was lawful.

### B.    Search of the Audi

The Defendant argues there was no probable cause to search the vehicle without a warrant under the automobile exception and there was no consent to search the car. (Dkt. 129, 217.) The Government maintains that the search of the Audi was lawful under either the automobile exception or the search incident to arrest doctrine. (Dkt. 159, 219.)

### (1)    Automobile Exception

"Under the automobile exception ... police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) (citation omitted). "Probable cause to search is evaluated in light of the totality of the circumstances." *Id.* at 1193–94 (quoting *United States v. Pinela–Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001)) (internal quotation marks omitted); *see also Illinois v. Gates*, 462 U.S. 213, 241 (1983). In *United States v. Arvizu*, 534 U.S. 266 (2002), the Supreme Court emphasized that courts "must look at the 'totality of the circumstances' of each case" rather than considering each piece of evidence in isolation.

The probable cause standard is a "practical, non-technical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). A probable cause determination is two-fold. First, a court must determine "historical facts," that is, the events leading up to the stop or search. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Second, the court must determine "whether those historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause. *Id.* Facts supporting probable cause can come from several sources, including the observations of law enforcement who use their expertise and training to draw inferences of criminal activity from behavior that is not criminal on its face. *See, e.g., Alford v. Haler*, 446 F.3d 935, 937 (9th Cir. 2006).

In this case, the totality of the circumstances establish probable cause existed to search the vehicle. The Defendant had provided officers with false information regarding his identity and was unable to produce any kind of identifying information or any of the documentation required to be operating a motor vehicle. In addition, the Defendant appeared to be nervous, agitated, and the officers got the sense that something was not right. The Defendant had clearly attempted to conceal his identity from the officers and he was arrested for providing false information to law enforcement. (Govt Ex. 24.)[2] It was reasonable for the officers to have believed that the Audi would contain contraband or evidence of the Defendant's identity given the officers had been told that the Defendant had been test-driving the Audi for a week to possibly purchase it. No wallet was found on

---

[2] Defendant was also cited for driving without insurance, possession of paraphernalia, driving while suspended, and resisting and obstructing. (Govt Ex. 23-24.)

the Defendant's person during the frisk and it is reasonable to think that a person driving a vehicle for a week would have some kind of identification in the vehicle if not found on his person. The vehicle contained a great many personal items located in plain view which the officers could reasonably have believed were the Defendants given he had been in possession of the vehicle for a week. (Govt. Ex. 7-8.) Deputy Warren also testified that there were cords by the radio inside the vehicle in plain view that lead him to believe there may be electronics in the Audi which may have also contained evidence of the Defendant's identity. Based on the foregoing, the Court finds that officers had probable cause to search the automobile for evidence of the crime of providing false information to law enforcement.

### (2)    Search Incident to Arrest

Because he was handcuffed and in the back of a patrol car, the Defendant argues he was not within reaching distance of the vehicle and, therefore, the search incident to arrest exception does not apply. (Dkt. 129.) The Government maintains that the search was lawful as it was incident to the arrest because it was reasonable to believe the officers would find some identification or other indicia revealing the Defendant's true identity; including the cell phone the Defendant was seen using while the officers were doing the license check. (Dkt. 159.)

The Supreme Court announced as the rule for vehicle searches incident to arrest in *Arizona v. Gant*, 556 U.S. 332 (2009) as follows:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Id.* at 1723–24. Here, the Defendant maintains that there was no reason to believe that identifying documents of any sort would be inside the Audi. (Dkt. 217.) The Government, on the other hand, argues the officers reasonably believed that evidence of the Defendant's true identity relevant to the charge of providing false information to law enforcement would be found in the Audi. (Dkt. 219.)

The Court finds the officers had a reasonable belief that evidence of the crime of the offense of arrest would be found in the vehicle. Mr. Gomez-Gutierrez told Deputy Warren that he had previously seen the Defendant in possession of an identification card. Further, it is reasonable to believe that an adult, such as the Defendant, would have some form of identification or some item that would reveal his identity located either on his person or within the vehicle in which he was traveling and had been using for a week. Since the officers did not discover a wallet or any other identifying information on the Defendant's person during their frisk the next logical place to look for evidence of his identity was the vehicle in which he was traveling and had been in possession. There were a number of personal items in plain view contained in the vehicle that the officers reasonably concluded belonged to the Defendant and that contain evidence of his identity. Given the totality of

the circumstances in this case, the Court finds the officers lawfully searched the vehicle incident to arrest.

### (3)     Inevitable Discovery

The Government argues that the evidence found during the vehicle search would have been discovered inevitably by lawful means during the later inventory search. (Dkt. 159.) Defendant counters that the Government has not proven that the evidence would have inevitably been discovered. (Dkt. 217.)

"The inevitable discovery doctrine acts as an exception to the exclusionary rule ... and permits the admission of otherwise excluded evidence if the government can prove [by a preponderance] that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quotation marks and ellipses omitted); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984).

Under the inevitable discovery doctrine, the Government is "required to prove, by a preponderance of the evidence, that there was a lawful alternative justification for discovering the evidence...." *United States v. Ruckes*, 586 F.3d 713, 719 (9th Cir. 2009). To meet that burden in the context of an inventory search, the Government must establish: (1) lawful impoundment of the vehicle; (2) standardized local inventory search procedure; and (3) compliance with that procedure. *See South Dakota v. Opperman*, 428 U.S. 364, 368–69, 375–76 (1976); *United States v. Bowhay*, 992 F.2d 229, 230 (9th Cir. 1993).

On the first point, the Government points to Idaho Code § 49-662(3)(b) as the basis

for the lawful impounding of the Audi. That statute states:

> (3) Any peace officer is authorized to remove or cause to be removed to the
> nearest garage or other place of safety any vehicle found upon a highway
> when:
>> (a) A report has been made that the vehicle has been stolen or
>> taken without the consent of its owner; or
>> (b) The person or persons in charge of the vehicle are unable
>> to provide for its custody or removal; or
>> (c) The person driving or in control of the vehicle is arrested
>> for an alleged offense for which the officer is required by law
>> to take the person arrested before a proper magistrate without
>> unnecessary delay.

Idaho Code § 49-662(3). In this case, both the driver and purported owner of the Audi, the

Defendant and Mr. Gomez-Gutierrez, were under arrest and neither were able to provide

for the custody or removal of the Audi. Mr. Gomez-Gutierrez may have tried to call his

girlfriend to ask her to secure the vehicle but there is no evidence that she was coming or

had actually been contacted. Additionally, neither individual could produce a driver's

license or any form of identification, proof of insurance, or vehicle registration. Although

the defense argues towing the Audi was unnecessary because the vehicle could have been

safely parked on the side of the road and impounding was not required, the fact remains

that under the statute the Audi was properly impounded because neither the driver nor

owner could provide for its custody or removal. (Dkt. 217 at 3 and Def. Ex. G-H.)

On the second and third points, the Court finds the Canyon County Sheriff's

Department has a standardized local inventory search procedure and the officers here

complied with that procedure. There is a written standardized local inventory search

procedure in Canyon County, Idaho whereby all property in a stored or impounded vehicle is to be inventoried. (Def. Ex. F at p. 3.) The policy states that the inventory includes the "trunk and any compartments or containers, even if closed and/or locked." (Def. Ex. F at 3.) The Court finds this is sufficient to satisfy the second and third prongs of the inevitable discovery doctrine.

The Defendant counters that the towing policy is not uniformly applied and, therefore, the bad-faith use of the procedures renders the search unreasonable. (Dkt. 217 at 4.) There was no evidence of any such bad-faith presented in this case. The officers here lawfully impounded the Audi and inventoried the contents of the Audi in accordance with their written standardized policy. As such, even if the search of the Audi at the scene had been unlawful, the evidence discovered would have inevitably been discovered by law enforcement regardless.

## 2.      Defendant's Statements to Confidential Informant

The Defendant argues any statements he made to a confidential informant (CI) on July 10, 2013 should be suppressed because he had been charged in state court and appointed counsel at that time. The Government argues there was no Sixth Amendment violation because the Defendant's Sixth Amendment right to counsel based upon the state charge does not operate to exclude any statements the Defendant made regarding the separate charges he now faces in federal court. (Dkt. 159 at 13.) Further, the Government asserts that the right to counsel is offense specific and that the CI did not stimulate

conversations about the charged federal crimes during their July 10, 2013 meeting. (Dkt. 219 at 5-6.)

The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right...to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel attaches when "a prosecution is commenced, that is, at or after the initiation of adversarial judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Sixth Amendment protections are, however, "offense specific ... [and] cannot be invoked once for all future prosecutions." *Id.* Sixth Amendment protections attach only to those offenses with which a defendant is charged, not all other past and potential criminal conduct.

On April 3, 2013, the Defendant was charged in state court with Trafficking in Methamphetamine; at which time counsel was appointed. (Def. Ex. A.) Ultimately, on June 13, 2013, the state court Judge granted the Defendant's motion to suppress and the state charge was dismissed. (Def. Ex. B.) Thereafter, the Defendant was charged in the Superseding Indictment in this case on July 9, 2013 with conspiring to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime. (Dkt. 24.) The following day, on July 10, 2013, the Defendant met with the confidential informant who recorded their exchange during which the Defendant made incriminating statements which are the subject of this Motion to Suppress.

At the time of their meeting, the state case had been dismissed and the Defendant was out of custody. However, as the Government acknowledges, the Defendant's Sixth Amendment right to counsel attached at the time he was indicted on July 9, 2013 as to the charges contained in the Superseding Indictment in this case. (Dkt. 219 at 5.)

Once a defendant's Sixth Amendment right to counsel attaches, the Government is forbidden from "deliberately eliciting" incriminating statements about the crimes charged from the defendant. *Massiah v. United States*, 377 U.S. 201, 206 (1964). These Sixth Amendment protections apply to conversations between confidential informants and defendants where the confidential informants relay incriminating statements from the defendant to the Government, just as they do to formal questioning. *United States v. Henry*, 447 U.S. 264, 274 (1980). In cases such as these, the Ninth Circuit has implemented a two-part test. *See Randolph v. California*, 380 F.3d 1133 (9th Cir. 2004).

In *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004), the Ninth Circuit laid out the test for determining whether an individual acting as a confidential informant violates a defendant's Sixth Amendment right to counsel, utilizing the "deliberate elicitation" language from the Supreme Court's *Massiah* and *Henry* decisions. This test requires a showing that (1) the confidential informant was acting as an agent of the State when he or she obtained the information from the defendant and that (2) the confidential informant made "some effort to 'stimulate conversations about the crime charged.'" *See Randolph*, 380 F.3d at 1144 (quoting *Henry*, 447 U.S. at 271 n. 9).

The confidential informant need not formally interrogate a defendant in order to violate the Sixth Amendment. "'[S]timulation' of conversation falls far short of 'interrogation.'" *Id.* (quoting *Fellers v. United States*, 540 U.S. 519, 522–25 (2004)). Where an informant is placed in close proximity to the defendant but makes no effort to stimulate conversations about the crime charged, there is no violation of the defendant's Sixth Amendment rights:

> [A] defendant does not make out a violation of [his Sixth Amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Kuhlmann v. Wilson*, 477 U.S. 436, 456-59 (1986). The Supreme Court concluded in *Kuhlmann* that the defendant's Sixth Amendment rights were not violated because the informant had not "deliberately elicited" any conversation because the statements made by the defendant were "unsolicited" and "spontaneous" and that the informant had "at no time asked any questions with respect to the crime." *Id.* at 440, 459.

Applying these principles here, the parties do not dispute that the CI was a government agent at the time he obtained the information from the Defendant on July 10, 2013. (Dkt. 219 at 6.) The issue in this case then is whether the CI stimulated conversations about the charged crimes such that he "deliberate elicited" the Defendant's incriminating responses or statements.

The Government represents that the purpose for the July 10, 2013 meeting was to determine where the Defendant was living so they could obtain a search warrant and safely arrest the Defendant. (Dkt. 219 at 6.) Their safety concern stemmed from the fact that law enforcement believed the Defendant had shot another person on March 25, 2013 and were aware that he frequently carried firearms. The defense disputes the purported purpose for the meeting and, regardless, contends that the purpose for the contact is irrelevant and the only question to resolve is whether the informant deliberately elicited statements from the Defendant about the charged crimes. (Dkt. 217 at 6.)

The confidential informant contacted the Defendant on July 10, 2013 at a hospital where he was visiting Michelle Ritch, with whom he was living with in a domestic partnership. The meeting was recorded by audio and video. (Govt. Ex. 9, 15, 21.) During the contact, the Defendant made statements about his living arrangements and finding new housing for he and Ms. Ritch. In addition, the Defendant made incriminating statements relating to his selling of methamphetamine as well as the shooting on March 25, 2013. In listening and watching the recordings of the exchange, the Court finds that in general the CI was not deliberately eliciting the Defendant's statements about the charged offenses in this case. The CI certainly interacted with the Defendant during their conversation which is necessary in order to maintain appearances.

There were, however, portions of the conversation where the CI took some action, beyond merely listening, that deliberately elicited incriminating remarks.[3] When the Defendant began talking about the person who was going to testify against him, the Defendant's comments were unprompted and are admissible. (Govt. Ex. 21 at 11.) However, the CI's response stating "How do we find him," the Court finds to have deliberately elicited incriminating remarks from the Defendant in violation of the Sixth Amendment. (Govt. Ex. 21 at 11.) Thus, the Court finds the Defendant's responses to the CI's question are inadmissible until the subject of the conversation changed back to living arrangements. (Govt. Ex. 21 at p. 11.) The Motion to Suppress is granted in this respect.

Later in the conversation the CI states "Dude. I can get $1,400 an ounce right now." which prompted the Defendant to make incriminating statements about the quantities and prices he was selling drugs for. (Govt. Ex. 21 at 13.) The Court finds this exchange to also be in violation of the Sixth Amendment because the CI's statement prompted the Defendant's incriminating statements about the charged offense. As such, the Court will grant the Motion to Suppress as to the Defendant's statements made in response to the CI's prompting, quoted above, until the Defendant changes the subject on his own by stating "I need fucking wheels. That's the biggest thing hurting right now." (Govt. Ex. 21 at p. 15.)

---

[3]Attached to this Order are portions of the updated written transcript from the audio/video recording taken by the CI on July 10, 2013. (Govt. Ex. 21.) This transcript was admitted for illustrative purposes and the actual audio/video recording is considered the true recitation of the exchange. The Court has reviewed the actual recording. For purposes of clarity, however, the Court has cited to and used the updated written transcript to indicate the particular portions of the recording that are suppressed pursuant to this Order. The excluded evidence is contained inside the boxes drawn on the written transcript on pages 11 and 13-17 of the attachment to this Order.

### 3.    Photo Identification

The Defendant asserts the identification should be suppressed because police suggestiveness created a substantial risk of mistaken identification as his photograph was the only one revealing any tattoos on his chest. (Dkt. 129.) The Defendant further argues, Mr. Harrod's identification of the Defendant from a photograph lineup was tentative and unreliable and Mr. Harrod did not have a good position to accurately view the individuals at the time of the crime. (Dkt. 129 at 12.) The Government counters that the photographic lineup was not unnecessarily suggestive and, even if it was, it did not create a substantial likelihood of misidentification. (Dkt. 159.)

When analyzing whether an identification based on a lineup should be suppressed, the court must determine if the procedures in question were impermissibly suggestive. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972); *United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir. 1983). Even if the procedures were suggestive, the resulting evidence is only excludable if it is not reliable. *Neil*, at 199-200.

The victim witness, David Harrod, had described to law enforcement the three individuals involved in the March 25, 2013 shooting. Ada County Sheriff's Office Major Crimes Detective Cherie Tucker testified that she interviewed the victim at the hospital a few hours after the shooting and that Mr. Harrod described the shooter as a 28 or 29 year old "white guy" with tattoos covering both arms, slender build, Irish with reddish hair, and facial hair. He also described the shooter as having worn a wind-breaker pull-over with a hood and a yellow color that stood out. Detective Tucker also testified that the victim was

on pain medication at the time she interviewed him and he had admitted to having used methamphetamine. The victim's interview providing these descriptions of the suspects was recorded. (Govt. Ex. 14.)

Based on Mr. Harrod's description, a photo lineup of the shooter was complied using six photographs of Caucasian males with facial hair of varying styles and length. (Govt. Ex. 16.)[4] Canyon County Sheriff's Office Deputy Craig Durrell showed the photo lineup to the victim and testified at this hearing concerning the victim's identification of the Defendant. Deputy Durrell testified that the photo lineup was compiled by other officers and his job was to show the lineup to the victim. An audio recording was made of the interview between Deputy Durrell and the victim when he was shown the photo lineups. (Govt. Ex. 13.)

The Defendant's Motion argues the lineup procedure was suggestive and created a substantial risk of mistaken identity because he is the only one in his lineup with any tattoos. (Dkt. 217 at 8.)The tattoos, the defense argues, are a unique feature of the Defendant as described by Mr. Harrod that only he possesses of all six of the individuals in the lineup. The Government counters that Mr. Harrod had described many physical features of the shooter, one of which was the tattoos on the shooter's arms, chest, and shoulders. The Government also contends that the Defendant's photo shows a faded tattoo

---

[4] Photo lineups of all three individuals involved in the shooting were compiled in the same manner and shown to the victim on the same day. The victim was unable to identify either of the other two individuals from the photo lineups and only the shooter was positively identified as the Defendant in this case.

on his neck that is "hardly visible" and a small portion of a tattoo on his chest. (Dkt. 219 at 7.)

Having reviewed the six photographs in the photo lineup at issue, the Court finds that the photo lineup was not unnecessarily suggestive and did not create a substantial risk of mistaken identity. Mr. Harrod's description of the shooter noted not only the presence of tattoos but also the individual's age, build, skin and hair color and type, and the presence of facial hair. The array of photographs in the lineup included individuals who each possessed the particulars described by Mr. Harrod. Moreover, the photograph of the Defendant in the lineup only barely reveals any tattoos. All that is shown are a very small piece of a tattoo on the Defendant's left-chest and what appears to be a neck tattoo that is either fading or very lightly inked. The presence of tattoos is only one feature of the description provided by Mr. Harrod and does not invalidate the whole lineup given all of the photographs in the series contained the other features detailed in Mr. Harrod's description. The fact that the Defendant's photograph is the only one in the lineup with tattoos showing is not unnecessarily suggestive given how minimally the tattoos are showing and the fact that all of the six photographs in the series included the other features as described by Mr. Harrod.

Further, the Court has reviewed the testimony of the officers who administered the photo lineup to the victim as well as the audio recordings of the interview. Having done so, the Court finds that the procedure used in this case was appropriate and not unnecessarily suggestive and did not create a substantial risk of mistaken identity. The officers

administering the lineup to the victim did not suggest anything one way or another to the victim as to how he should make an identification, if any. The officers simply explained the procedure and the Photograph Series Admonition Form and allowed Mr. Harrod time to review each series until he was able to initial the appropriate selection on the admonition form. During the process, Mr. Harrod talked his way through each series of photograph lineups in making his decisions which the officers allowed him to do but did not make any suggestions other than to assist him with the process itself. (Govt. Ex. 13, 14.)

Even if the procedures were determined to have been suggestive, the Court finds that Mr. Harrod's identification is reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). This question asks whether the reliability of the identification is sufficient to outweigh any suggestiveness of the procedure such that there is not a substantial likelihood of misidentification. *Neil*, 409 U.S. at 199. Courts generally consider five factors in evaluating whether the identification was nonetheless reliable despite the impermissibly suggestive identification procedure including: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification procedure; and (5) the length of time between the crime and the identification procedure. *Neil*, 409 U.S. at 199–200.

As to the first factor, Mr. Harrod traveled in the backseat of a vehicle driven by the shooter with two other individuals occupying the other seats in the car. Mr. Harrod was

present with the shooter outside of the car for approximately thirty minutes prior to the shooting once they arrived at their destination. Further, the shooting occurred during the day time. Based on this, the Court finds that the victim had ample opportunity to view the shooter at the time of the crime.

On the second and third factors, the Court finds Mr. Harrod's degree of attention to have been extremely high and accurate given he was the victim of the shooting and was able to provide detailed descriptions of all three individuals in the car. Although the defense challenges the accuracy of Mr. Harrod's description and attention, in particular as to the other two non-shooter suspects, the Court's own view of Mr. Harrod's attention and descriptions are that they were quite detailed and accurate. The audio tapes of Mr. Harrod's initial interview at the hospital after the shooting and during the photo lineup show Mr. Harrod's descriptions and memory of the individuals were detailed, consistent, and quite strong.

The fourth factor, the level of certainty demonstrated by the witness at the identification procedure, is best reveled in the audio recording of the interview with Mr. Harrod when he was shown the photo arrays. In that interview, Mr. Harrod was careful in not wanting to mistakenly identify an innocent man. When he viewed the photograph of the Defendant, however, Mr. Harrod took his time and made certain that the photograph was in fact the shooter. On the audio, Mr. Harrod stated time and time again with certainty "that has got to be him." (Govt. Ex. 13.)

Finally, the fifth factor looks at the length of time between the crime and the identification. Detective Tucker interviewed Mr. Harrod at the hospital only a few hours after the shooting to obtain his descriptions of the individuals. Based on that description, the photo lineup was compiled and shown to Mr. Harrod only eight days after the shooting.

Based on the foregoing, the Court finds that even if there were some suggestiveness found in the photograph lineup procedure, the reliability of Mr. Harrod's identification is sufficient to outweigh any suggestiveness such that there is not a substantial risk of mistaken identification. Accordingly, the Motion to Suppress is denied as to the photo lineup evidence.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Motion to Suppress (Dkt. 129) is **GRANTED in part and DENIED in part**. The trial in this matter remains set for **Tuesday, March 11, 2014** at 9:30 a.m. in Boise, Idaho.

DATED: **February 6, 2014**

Honorable Edward J. Lodge
U. S. District Judge